## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## MIDLAND/ODESSA DIVISION

| | |
|---|---|
| K.MIZRA LLC,<br><br>                    Plaintiff,<br><br>v.<br><br>NXP Semiconductors N.V., NXP B.V., AND NXP USA, INC.,<br><br>                    Defendants. | CIVIL ACTION NO. 7:25-cv-557<br><br>**JURY TRIAL DEMANDED** |

### PLAINTIFF'S COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff K.Mizra LLC files this Complaint against Defendants NXP Semiconductors N.V., NXP B.V., and NXP USA, Inc. (together "NXP" or "Defendants") for infringement of U.S. Patent No. 8,374,154 ("the '154 patent") and U.S. Patent No. 8,873,531 ("the '531 patent") (collectively, the "Asserted Patents").

### THE PARTIES

1.      K.Mizra LLC ("K.Mizra") is a Delaware Limited Liability Company with a place of business at 777 Brickell Avenue, #500-96031, Miami, Florida 33131.

2.      On information and belief, NXP Semiconductors N.V. ("NXP NV") is a company organized and existing under the laws of the Netherlands, having a place of business at High Tech Campus 60, 5656 AG, Eindhoven, the Netherlands.

3.      On information and belief, NXP B.V. ("NXP BV") is a company organized and existing under the laws of the Netherlands, having a place of business at High Tech Campus 60, 5656 AG Eindhoven, the Netherlands. NXP BV is a wholly-owned and wholly-controlled subsidiary of NXP Semiconductors N.V.

4.     On information and belief, NXP USA, Inc. ("NXP USA") is a corporation organized under the laws of Delaware. On information and belief, NXP USA is a wholly-owned and wholly-controlled subsidiary of NXP Semiconductors N.V. NXP USA, Inc. has places of business in this District, including its U.S. Corporate Headquarters located at 6501 W. William Cannon Dr., Austin, TX 78735; and 3501 Ed Bluestein Blvd., Austin, TX 78721.

5.     Defendants are engaged (including, as relevant, in the past) in making, using, selling, offering for sale, and/or importing, and/or inducing one another and their respective subsidiaries, affiliates, distributors, suppliers, retail partners, and customers in the making, using, selling, offering for sale, and/or importing throughout the United States, including within this District, products that support, or are marketed as supporting, Wi-Fi 5 (802.11ac), Wi-Fi 6 (802.11ax), and/or Wi-Fi 7 (802.11be) (the "Accused Products"), including (but not limited to) NXP 88W8887; NXP 88W8987; NXP 88W8964; NXP 88W8997; NXP Apalis iMX8QM; NXP 88W8897; NXP 88W8897P; NXP 88W9098; NXP 88W9064; NXP AW690; NXP AW693; NXP AW692; NXP AW611; NXP 88W9064; NXP IW620; NXP IW612; NXP IW610; NXP IW611.[1]

6.     On information and belief, NXP NV and NXP BV maintain (and have maintained) a corporate presence in the United States via at least its U.S.-based sales and/or distribution subsidiaries and/or agents, including NXP USA.

7.     On information and belief, NXP NV controls (and has controlled) NXP BV, as well as many other subsidiaries, including NXP USA. On information and belief, NXP USA and/or NXP BV provide (and have provided) sales, distribution, research, and/or development support in

---

[1] Wi-Fi products are designed to be backwards compatible with older Wi-Fi standards. Thus, Wi-Fi 6 products are backwards compatible with (and support) Wi-Fi 5 features and protocols and Wi-Fi 7 products are backwards compatible with (and support) Wi-Fi 5 and Wi-Fi 6 features and protocols.

the United States for their parent NXP NV, which owns NXP BV and NXP USA. NXP BV and NXP USA are, and have been, agents of NXP NV. At the direction and control of NXP NV, its subsidiaries, including NXP BV, and/or U.S.-based sales and/or distribution subsidiaries including, NXP USA, have imported and continue to import Accused Products into the United States and this District.

8.       On information and belief, NXP BV controls (and has controlled) many subsidiaries, including NXP USA. On information and belief, NXP USA provides (and has provided) sales, distribution, research, and/or development support in the United States for its parent NXP BV, which owns NXP USA. NXP USA is, and has been, an agent of NXP BV. At the direction and control of NXP BV, U.S.-based sales and/or distribution subsidiaries including, NXP USA, have imported and continue to import Accused Products into the United States and this District.

9.       On information and belief NXP NV controls (and has controlled) each of NXP BV and NXP USA. On information and belief, each of these related companies and other NXP companies are, and have been, agents of NXP NV. For example, NXP NV, NXP BV, and NXP USA use the same logo, further emphasizing that these companies are alter egos and/or agents of one another.

10.       On information and belief, NXP NV, NXP BV, and NXP USA, along with their respective foreign and U.S.-based subsidiaries, affiliates, distributors, retail partners, and customers (which act as part of a global network and supply chain of overseas sales and manufacturing subsidiaries), have operated as agents of one another and vicariously as parts of the same business group to work in concert together and enter into agreements that are nearer than

arm's length to provide (and have provided) a distribution channel of infringing products within this District and the U.S. nationally.

11.     NXP NV, NXP BV, and NXP USA operate (and have operated) in agency with one another and their respective foreign and U.S.-based subsidiaries, affiliates, distributors, retail partners, suppliers, and customers, to provide a distribution channel of infringing products within this District and the U.S. nationally. NXP NV, NXP BV, and NXP USA, individually and/or between one another and their respective agents and foreign and U.S.-based subsidiaries, affiliates, distributors, retail partners, suppliers, and customers, purposefully direct (and have directed) the Accused Products into established distribution channels within this District and the U.S. nationally.

12.     On information and belief, NXP NV, NXP BV, and NXP USA, including their respective U.S.-based subsidiaries, affiliates, distributors, retail partners, and customers (which act as part of a global network and supply chain of overseas sales and manufacturing subsidiaries), have operated as agents of one another and vicariously as parts of the same business group to work in concert together and enter into agreements that are nearer than arm's length. NXP NV, NXP BV, and NXP USA, and their U.S.-based sales subsidiaries, individually and/or in concert, conduct business (and have conducted business) in the United States, including importing, using, testing, distributing, offering to sell, and selling the Accused Products that incorporate devices, systems, and processes that infringed the Asserted Patents in Texas and this District. *See Trois v. Apple Tree Auction Center, Inc.*, 882 F.3d 485, 490 (5th Cir. 2018) ("A defendant may be subject to personal jurisdiction because of the activities of its agent within the forum state…."); *see also Cephalon, Inc. v. Watson Pharmaceuticals, Inc.*, 629 F. Supp. 2d 338, 348 (D. Del. 2009) ("The agency theory may be applied not only to parents and subsidiaries, but also to companies that are 'two arms of

the same business group,' operate in concert with each other, and enter into agreements with each other that are nearer than arm's length.").

13.     Through offers to sell, sales, imports, distributions, and other related agreements to transfer ownership of Defendants' Accused Products by and/or to affiliates, distributors, subsidiaries, suppliers, retail partners, customers, agents, and/or other Defendants, Defendants are operating in (and have operated in) and maintaining (and maintained) a significant business presence in the U.S. and/or through their U.S. subsidiaries or agents, Defendants do business in the U.S., the state of Texas, and in this District.

14.     NXP NV, NXP BV, and NXP USA are companies which together comprise "a global semiconductor company and a long-standing supplier in the industry, with over 70 years of innovation and operating history." *See* NXP Semiconductors N.V. Form 10-K (FY ended December 31, 2024), *available at* https://investors.nxp.com/static-files/124a48d0-1a7a-481e-8cda-023740f53e4c, at page 3. According to NXP, it provides technology solutions "in the domains of cryptography-security, high-speed interface, radio frequency (RF), mixed-signal analog-digital (mixed A/D), power management, digital signal processing and embedded system design." *Id*. NXP's "product solutions are used in a wide range of end market applications including: automotive, industrial & Internet of Things (IoT), mobile, and communication infrastructure." *Id*.

15.     NXP NV, NXP BV, and NXP USA share the same management, common ownership, advertising platforms, facilities, distribution chains and platforms, and infringing product lines and products involving related technologies. On information and belief, Defendants operate as a single business entity and/or in concert with each other to manufacture, sell, offer to sell, import, market, advertise, and/or otherwise promote the Accused Products in the United

States, including in the State of Texas generally and this District in particular. On information and belief, Defendants share directors, executives, and employees. According to NXP, "NXP has one reportable segment representing the entity as a whole, which reflects the way in which our chief operating decision maker … executes operating decisions, allocates resources, and manages the growth and profitability of the Company." *See* NXP Semiconductors N.V. Form 10-K (FY ended December 31, 2024), *available at* https://investors.nxp.com/static-files/124a48d0-1a7a-481e-8cda-023740f53e4c, at page 3; *see also id.* at page 8 ("We manage our manufacturing assets together through one centralized organization to ensure we realize scale benefits in asset utilization, purchasing volumes and overhead leverage across businesses.").

16.    NXP, as a single enterprise of multiple operating subsidiaries acting in concert with one another, has a common Board of Directors with responsibility "for the overall conduct of the NXP Group." *See* Rules Governing the Board of Directors of NXP Semiconductors N.V. (Nov. 2023), *available at* https://www.nxp.com/docs/en/supporting-information/RULESGOVBRD.pdf, at Article 1.1. Annually, the common Board of Directors of the NXP Group sets "the corporate strategy of the NXP Group." *Id.* at Article 1.3(b). The collective set of NXP entities, including Defendants, is managed, in concert, by a common management team to direct the manufacture, distribution, and sale of NXP products, including the Accused Products.

17.    NXP USA is a subsidiary of both NXP NV and NXP BV and engages in sales, advertising, marketing, and/or research in the United States on behalf of, and under the control of NXP NV and NXP BV. "NXP owns and operates four wafer fabrication facilities in the US, two of which are in Austin, Texas . . . . The representative products of these fabs include microcontrollers (MCUs) and microprocessors (MPUs), power management devices, RF

transceivers, amplifiers and sensors." *See* Ex. A, https://www.nxp.com/company/about-nxp/worldwide-locations/united-states:USA.

18.    NXP employs numerous employees in Austin who possess information relevant to issues involving the Accused Products, including at least: (1) Executive VP and CFO, who possesses knowledge related to the revenue of the accused products; (2) Senior VP and Chief IP Officer, who possesses knowledge relevant to damages and the hypothetical negotiation; (3) Senior Director and Head of IP Monetization, who has submitted patents relevant to the Accused Products and possesses knowledge relevant to damages; (4) Executive VP, General Counsel, Corporate Secretary, and Chief Sustainability Officer, who would possess information relevant to damages and reasonable royalty analysis; (5) Executive VP, Global Operations, who is responsible for overseeing NXP's manufacturing operations and would have relevant knowledge on the manufacturing of the Accused Products; (6) NXP's global head of sales, who possesses relevant knowledge of the sales and marketing of the Accused Products; (7) Technical Director, who works on the Accused Products; and various other individuals with responsibilities for the Accused Products, such as NXP's i.MX 8M Applications Processors. *See MIMO RESEARCH, LLC v. NXP USA, Inc.*, No. W:22-CV-00501-ADA (W.D. Tex. Apr. 20, 2023), Dkt. 71 at pp. 9-10.

19.    NXP has posted numerous job listings in Austin that are related to the research, development, manufacturing, sales, testing, and/or marketing of the Accused Products. *See* Ex. B, https://nxp.wd3.myworkdayjobs.com/careers?locations=3db468d56aa610d690867492f6a44a10 &locations=3db468d56aa610d6908623b4269049aa (exemplary NXP job titles in Austin include Senior Business System Analyst – Sales, Principal Data Scientist - Sales and Marketing, SOC Lead, Senior Manager & Regional Lead – Export Control and Sanctions Compliance, Sr. Connectivity Product Marketing Manager). NXP has previously posted job listings in Austin for

the following positions related to the research, development, manufacturing, sales, testing, and/or marketing of the Accused Products: Segment Lead (Director Level), Marketing Manager - Home and Building Automation, Director, Segment Lead-Home and Building Automation, Sr. Diffusion Equipment Engineer, AI/ML driven ASIC Design and Implementation Automation Expert, Test Engineering Manager - IoT & Auto Edge Products, Senior Business System Analyst – Sales, Technical Director Systems Architecture - MPU Products, Regional Marketing Manager, Sr. Product Marketing Manager - Industrial, IoT, Automotive Edge Products.

20.    NXP owns, manages, and/or operates a highly interactive website at https://www.nxp.com/. NXP USA, Inc. is listed as the registrant and contact for the NXP.com website. *See* Ex. C, https://lookup.icann.org/en/lookup.

21.    The "Privacy Statement" webpage on the NXP.com website states that "When this Privacy Statement refers to 'we', 'us' or 'our', it refers to NXP B.V. and affiliates or subsidiaries which under this Privacy Statement may act as a controller of your personal information . . . ." *See* Ex. D, https://www.nxp.com/pages/privacy-statement:PRIVACYPRACTICES.  Furthermore, the Privacy Statement also provides contact details for questions regarding the Privacy Statement to be addressed to NXP Semiconductors N.V., Attn. Data Protection Office, High Tech Campus 60, 5656AG Eindhoven, The Netherlands. *Id.* A link to this Privacy Statement is included on all webpages of the NXP.com website.

22.    From the NXP.com website, customers and end users in the United States can purchase NXP products including but not limited to the Accused Products. *See* Ex. E, https://www.nxp.com/support/sample-and-buy:SAMPLE-BUY ("Whether you prefer to purchase direct from us or use your preferred distributor you'll find quantities and pricing for all our NXP and third-party products.") NXP explains, "Through our online catalog and shopping cart, you can

quickly and easily buy parts, software, development tools or third-party products that have a 'Add to cart' button Buy from NXP next to them. Simply click the button to add the product to your cart and then make your purchase using major credit cards, wire transfers or purchase orders. Items can be shipped to virtually anywhere in the world." *See* Ex. F., https://www.nxp.com/support/sample-and-buy/buy-from-nxp:WTOBUY_BUYDIRECT.

23.    The NXP.com website offers extensive and interactive training for customers and end users on the design and use of NXP products, including the Accused Products. *See* Ex. G, https://www.nxp.com/support/support/training:TRAINING-EVENTS.

24.    The NXP.com website provides customers, potential customers, and/or end users located in the United States or elsewhere with real-time, interactive support and guidance on the use of NXP products, including but not limited to the Accused Products. *See* Ex. H, https://www.nxp.com/support/support:SUPPORTHOME. For example, customers, potential customers, and/or end users can interact with the NXP.com website to provide support and guidance as to NXP products, including the Accused Products. *Id.* Such interaction provided by the NXP.com website includes participating in an open forum for technical discussions moderated by NXP experts; requesting confidential assistance with an NXP support professional through support tickets; or participating in a live chat with NXP employees. *Id.*

25.    NXP provides additional interactivity for those customers and end users who create an account on the NXP.com website. For the website users with an NXP.com account, NXP offers: "Access to our full public library of technical content, including documentation, training, and software via collections; Access authorized secure information about our products. Apply online for an NDA with NXP to get started; Engage with a vibrant and active ecosystem of engineers and specialists in the NXP Community; Get timely and confidential world-class assistance from an

NXP Support Professional; Queue up multiple documents or items to download when it's easiest for you using the download manager; and Get the first notification about new NXP products and services via our newsletter." *See* Ex. I, https://www.nxp.com/support/support/my-nxp-account-benefits/my-nxp-account-faqs:NXP-ACCOUNT-FAQS.

26.    NXP encourages and rewards active engagement on the NXP.com website by NXP customers and end users. For example, NXP.com users can earn badges and rewards. *See* Ex. J, https://www.nxp.com/support/support/my-nxp-account-benefits:NXP-ACCOUNT-BENEFITS.

27.    NXP is willing to share "Proprietary or Confidential Information" with those customers and end users who create an account on the NXP.com website and complete a Non-Disclosure Agreement with NXP. *See* Ex. K, https://www.nxp.com/support/support/non-disclosure-agreement-faqs:NDA-FAQS. The NXP.com website permits users to "Apply for an NDA with NXP" directly through the NXP.com website. *Id*. The website also includes a "Sample Letter," which provides a template for an NDA between an NXP.com website user and an NXP entity to be filled in by an NXP employee. *Id*.

28.    28.    On information and belief, NXP NV, NXP BV, and NXP USA operate as a unitary business venture and are jointly and severally liable for the acts of patent infringement alleged herein.

## JURISDICTION AND VENUE

29.    This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 1, *et seq*., including, without limitation, 35 U.S.C. §§ 271, 281, 284, and 285.

30.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

31.     With respect to NXP NV and NXP BV (the "foreign Defendants"), venue is proper in this District pursuant to 28 U.S.C. §§ 1391(c). The foreign Defendants are foreign entities and may be sued in any judicial district under 28 U.S.C. § 1391(c)(3).

32.     With respect to NXP USA, venue is proper in this District under 28 U.S.C. § 1400(b). NXP USA has committed acts of infringement in the District and/or has induced acts of patent infringement by others in this District and has a regular and established place of business within the District. For example, NXP USA has regular and established places of businesses within this District including its U.S. Corporate Headquarters located at 6501 W. William Cannon Dr., Austin, TX 78735; and 3501 Ed Bluestein Blvd., Austin, TX 78721.

33.     This Court has general and specific personal jurisdiction over the Defendants pursuant to due process and/or the Texas Long Arm Statute because, inter alia, (i) the Defendants have done and continue to do business in Texas and/or (ii) the Defendants have, directly and through intermediaries, distributers, agents, and/or others committed and continue to commit acts of patent infringement in the State of Texas, including making, using, offering to sell, and/or selling Accused Products in Texas, and/or importing Accused Products into Texas, including by Internet sales (including acts of infringement via NXP.com's highly interactive website) and/or sales via retail and wholesale stores, inducing others to commit acts of patent infringement in Texas (including inducement via NXP.com's highly interactive website), and/or committing a least a portion of any other infringements alleged herein. Defendants have placed, and are continuing to place, infringing products into the stream of commerce, via established distribution channels, with the knowledge and/or understanding that such products are sold in Texas, including in this District. Defendants have derived substantial revenues from their infringing acts occurring within Texas and within this District. Defendants have substantial business in this State and District

(including, as relevant, in the past), including: (A) conducting at least part of their infringing activities alleged herein; and (B) regularly doing or soliciting business, engaging in other persistent conduct, and/or deriving substantial revenue from infringing goods offered for sale, sold, and/or imported, and services provided to Texas residents vicariously through and/or in concert with their respective alter egos, intermediaries, agents, distributors, importers, customers, subsidiaries, and/or consumers.

34.     This Court has personal jurisdiction over Defendants, directly or through intermediaries, distributors, importers, customers, subsidiaries, and/or consumers including their U.S.-based sales subsidiaries, as applicable. Through direction and control (including, as relevant, in the past) of such subsidiaries, affiliates, distributors, retail partners, agents, and/or customers, Defendants have committed acts of direct and/or indirect patent infringement within Texas, and elsewhere within the United States, giving rise to this action and/or have established minimum contacts with Texas such that personal jurisdiction over Defendants would not offend traditional notions of fair play and substantial justice. Upon information and belief, Defendants compensate their U.S.-based subsidiaries and/or agents for their sales support services in the United States. As such, Defendants have a direct financial interest in their U.S.-based subsidiaries and/or agents, and vice versa.

35.     Personal jurisdiction is proper because Defendants have committed acts of infringement in this District. This Court has personal jurisdiction over Defendants because, inter alia, this action arises from activities Defendants purposefully directed towards the State of Texas and this District (including Defendants' activities via NXP.com's highly interactive website).

36.     On information and belief, NXP (directly and/or through its subsidiaries, affiliates, or intermediaries) owns, operates, or controls facilities that include offices and fabrication facilities

in Austin, Texas where infringing products are designed, developed, manufactured, tested, used, marketed, imported, exported, offered for sale, and/or sold into a stream of commerce that includes this District. On information and belief, NXP employs over 1700 employees in the Austin area. *See* Ex. L, NXP Semiconductors LinkedIn Profile, https://www.linkedin.com/company/nxp-semiconductors/people/?facetGeoRegion=90000064.

37.    Exercising personal jurisdiction over Defendants in this District would not be unreasonable given Defendants' contacts in this District and the interest in this District of resolving disputes related to products sold herein.

38.    In addition, Defendants, as applicable, have knowingly induced infringement within this District by advertising, marketing, offering for sale and/or selling devices pre-loaded with infringing functionality within this District, to consumers, customers, manufacturers, distributors, resellers, partners, and/or end users, and providing instructions, user manuals, advertising, and/or marketing materials which facilitate, direct or encourage the use of infringing functionality with knowledge thereof (including such activities provided via Defendants' NXP.com website).

39.    Personal jurisdiction also exists specifically over Defendants because Defendants, directly or through affiliates, subsidiaries, agents, and/or intermediaries, transact business (or have transacted business) in this State or purposefully directed business at this State by making, importing, testing, offering to sell, selling, and/or having sold infringing products within this State and District or purposefully directed at this State or District.

40.    Personal jurisdiction also exists specifically because Defendants and/or their U.S.-based subsidiaries, as applicable, have overlapping executives, interlocking corporate structures,

and close relationships as manufacturer, importer, distributor, and/or seller of the products accused of infringement.

41.    To the extent the foreign Defendants are not subject to jurisdiction in any state's court of general jurisdiction, exercising jurisdiction over the foreign Defendants in this State and this District would be consistent with due process and this State's long-arm statute and under national contacts in light of the facts alleged in this Complaint.

42.    In addition, Defendants, directly or through other Defendants, affiliates, subsidiaries, agents, and/or intermediaries, have placed infringing products into the stream of commerce knowing they would be sold and used in Texas, and economically benefit from the retail sale of infringing products in this State, including in this District.

43.    Defendants have advertised their infringing products to customers in Texas and this District through their NXP.com website.

44.    On information and belief, the foreign Defendants control (or have controlled) or otherwise direct (or directed) and authorize (or authorized) all activities of their U.S.-based agents and/or sales and/or distribution subsidiaries, as applicable. Such directed and authorized activities include the U.S.-based subsidiaries' and/or agents having used, offered for sale, sold, and/or imported the Accused Products, their components, processes, and/or products containing the same that incorporated the fundamental technologies and claims of the Asserted Patents. The foreign Defendants' U.S.-based sales and/or distribution subsidiaries and/or agents were authorized to import, distribute, sell, or offer for sale the Accused Products on behalf of the foreign Defendants. For example, the foreign Defendants researched, designed, developed, and manufactured the Accused Products, and then directed their U.S.-based sales subsidiaries, distributers, agents, and others to import, distribute, offer for sale, and sell the Accused Products in the United States. *See,*

*e.g., United States v. Hui Hsiung*, 778 F.3d 738, 743 (9th Cir. 2015) (finding that the sale of infringing products to third parties rather than for direct import into the U.S. did not "place [defendants'] conduct beyond the reach of United States law [or] escape culpability under the rubric of extraterritoriality"). Thus, Defendants conducted infringing activities, and the foreign Defendants' U.S.-based sales subsidiaries and/or distributers and/or agents conducted infringing activities on behalf of the foreign Defendants.

45.     On information and belief, the foreign Defendants' U.S.-based sales and/or distribution subsidiaries' and/or agents' presence (including in the past) in the United States gave the foreign Defendants substantially the same business advantages that they would have enjoyed if the foreign Defendants conducted their business through their own offices or paid agents in the state. The foreign Defendants' U.S.-based sales subsidiaries and/or distributers and/or agents were authorized to import, distribute, sell, and offer for sale Defendants' products, including Defendants' Accused Products, as well as their components and processes related to the same, on behalf of the foreign Defendants. For example, Defendants' U.S.-based sales subsidiaries operated within Defendants' global network and supply chain of sales subsidiaries. In the U.S., including within this District, Defendants' Accused Products, as well as their components and processes related to the same, were imported, distributed, offered for sale, and/or sold.

46.     Via Defendants' alter egos, agents, intermediaries, distributors, importers, customers, subsidiaries, and/or consumers that maintained a business presence, operating in, and/or residing in the U.S., Defendants' products, including products and processes accused of infringing the Asserted Patents, are or have been widely distributed and sold in Texas including within this District. *See Litecubes, LLC v. Northern Light Products, Inc.*, 523 F.3d 1353, 1369-70 (Fed. Cir. 2008) ("[T]he sale [for purposes of § 271] occurred at the location of the buyer."); *see*

*also Semcon IP Inc. v. Kyocera Corp.*, No. 2:18-cv-00197-JRG, 2019 WL 1979930, at *3 (E.D. Tex. May 3, 2019) (denying accused infringer's motion to dismiss because plaintiff sufficiently plead that purchases of infringing products outside of the United States for importation into and sales to customers in the U.S. may constitute an offer to sell under § 271(a)).

47.    On information and belief, Defendants have placed infringing products and/or products that practiced infringing processes into the stream of commerce via established distribution channels comprising at least their subsidiaries, affiliates, distributors, and/or agents or customers, with the knowledge and/or intent that those products were imported, used, offered for sale, and sold in the United States and Texas, including in this District. As a result, Defendants have, vicariously through and/or in concert with other Defendants, alter egos, agents, intermediaries, distributors, affiliates, importers, customers, subsidiaries, and/or consumers, placed the Accused Products into the stream of commerce via established distribution channels with the knowledge and/or intent that those products were sold and continue to be sold in the United States and Texas, including in this District.

48.    In the alternative, the Court has personal jurisdiction over the foreign Defendants under Federal Rule of Civil Procedure 4(k)(2), because the claims for patent infringement in this action arise under federal law, foreign Defendants are not subject to the jurisdiction of the courts of general jurisdiction of any state and exercising jurisdiction over the foreign Defendants is consistent with the U.S. Constitution.

49.    The foreign Defendants have minimum contacts with the United States. The foreign Defendants offer their stock on NASDAQ. Furthermore, the foreign Defendants have purposefully targeted the U.S. market and this District as to the Accused Products by acquiring U.S. companies as evidenced by NXP's merger with Freescale Semiconductor, Ltd. in 2015 and NXP's acquisition

of Marvell's Wi-Fi Connectivity Business in 2019. Additionally, the foreign Defendants purposefully target U.S. users of their NXP.com website to: gather privacy information; provide instruction materials, training, support, and user guides of NXP products, including the Accused Products; and/or offer for sale, ship, distribute, import, and/or sell NXP products, including the Accused Products, directly from NXP or via its distributors or intermediaries.

## THE ASSERTED PATENTS

50.    K.Mizra is the sole and exclusive owner of all right, title, and interest in the Asserted Patents and holds the exclusive right to take all actions necessary to enforce its rights in, and to, the Asserted Patents, including the filing of this patent infringement lawsuit. Indeed, K.Mizra owns all substantial rights in the Asserted Patents, including the right to exclude others and to recover damages for all past, present, and future infringements.

51.    The '154 patent is entitled, "Device, System and Method of Simultaneously Communicating with a Group of Wireless Communication Devices." The '154 patent lawfully issued on February 12, 2013 and stems from U.S. Patent Application No. 12/645,648, which was filed on December 23, 2009.

52.    The '531 patent is entitled, "Device, System and Method of Indicating Station-Specific Information within a Wireless Communication." The '531 patent lawfully issued on October 28, 2014 and stems from U.S. Patent Application No. 12/772,259, which was filed on May 3, 2010.

53.    The claims of the Asserted Patents are directed to patent-eligible subject matter under 35 U.S.C. § 101. They are not directed to an abstract idea, and the technologies covered by the claims comprise systems and/or ordered combinations of features and functions that, at the time of invention, were not, alone or in combination, well-understood, routine, or conventional.

54.    K.Mizra has complied with the requirements of 35 U.S.C. § 287 at least by filing this complaint and providing pre-suit notice as outlined below.

## COUNT I

### (INFRINGEMENT OF U.S. PATENT NO. 8,374,154)

55.    K.Mizra incorporates the preceding paragraphs herein by reference.

56.    This cause of action arises under the patent laws of the United States, and, in particular, 35 U.S.C. §§ 271, *et seq*.

57.    K.Mizra is the owner of all substantial rights, title, and interest in and to the '154 patent, including the right to exclude others and to enforce, sue, and recover damages for past, present, and future infringements.

58.    The '154 patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on February 12, 2013, after full and fair examination.

59.    NXP has infringed (and continues to infringe) one or more claims of the '154 patent in this District and elsewhere in Texas and the United States by making, using, selling, offering to sell, and/or importing, and by actively inducing others to make, use, sell, offer to sell, and/or import, Accused Products, which include (but are not limited to) NXP 88W8887; NXP 88W8987; NXP 88W8964; NXP 88W8997; NXP Apalis iMX8QM; NXP 88W8897; NXP 88W8897P; NXP 88W9098; NXP 88W9064; NXP AW690; NXP AW693; NXP AW692; NXP AW611; NXP 88W9064; NXP IW620; NXP IW612; NXP IW610; NXP IW61l. Upon information and belief, each Accused Product supports Wi-Fi communications according to the 802.11ac (and later) specifications, including devices marketed as supporting Wi-Fi 5, Wi-Fi 6, and/or Wi-Fi 7.

*Direct Infringement (35 U.S.C. § 271(a))*

60.    NXP directly infringes one or more claims of the '154 patent in this District and elsewhere in Texas and the United States.

61.     To this end, NXP directly infringes, either by itself or via its agent(s), at least claim 18 of the '154 patent under 35 U.S.C. § 271(a) by using (including through testing or demonstration), selling, offering to sell, and/or importing Accused Products. Furthermore, NXP made and sold the Accused Products outside of the United States and either delivered those products to its customers, distributors, and/or subsidiaries in the United States, or, in the case that it delivered the Accused Products outside of the United States, it did so intending and/or knowing that those products were destined for the United States and/or designed and designated for sale in the United States, thereby directly infringing the '154 patent. *See, e.g., Lake Cherokee Hard Drive Techs., L.L.C. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013).

62.     By way of illustration only, the Accused Products meet each and every element of claim 18 of the '154 patent based on their support and/or use of VHT features and protocols, including the VHT sounding protocol. The Accused Products include or are associated with memory that stores instructions for implementing wireless communications according to 802.11ac (Wi-Fi 5) standards (i.e., the Accused Products include "[a] computer program product comprising a non-transitory storage medium having stored thereon instructions").

63.     The Accused Products include instructions that, when executed, result in "reserving, by a wireless communication unit, a wireless communication medium for a time period." For example, as evidenced by the 802.11ac standards, the Accused Products include instructions that cause a wireless access point to transmit a VHT NDP Announcement frame, which is a control frame that, among other things, reserves a WLAN channel for a period indicated by a "Duration" field.

**8.3.1.20 VHT NDP Announcement frame format**

The frame format of the VHT NDP Announcement frame is shown in Figure 8-29j.



**Figure 8-29j—VHT NDP Announcement frame format**

IEEE 802.11ac-2013, p. 44.

     64.    The Accused Products include instructions that, when executed, result in a wireless communication unit "during the reserved time period, transmitting at least one beamforming-training initiation frame from the wireless communication unit to a group of plurality of wireless communication devices using one or more addresses assigned to the plurality of wireless communication devices in the group." For example, as evidenced by the 802.11ac standards, the Accused Products include instructions that cause a wireless access point unit to transmit a VHT NDP frame ("beamforming-training initiation frame") to a group of STAs represented by the GroupID subfield of the VHT-SIG-A field included in the VHT NDP frame.

**22.3.12 VHT preamble format for sounding PPDUs**

NDP is the only VHT sounding format.

The format of a VHT NDP PPDU is shown in Figure 22-28.



**Figure 22-28—VHT NDP format**

NOTE—The number of VHT-LTF symbols in the NDP is determined by the SU NSTS field in VHT-SIG-A.

The VHT NDP PPDU has the following properties:
— uses the VHT PPDU format but without the Data field
— is a VHT SU PPDU as indicated by the VHT-SIG-A field
— has the data bits of the VHT-SIG-B field set to a fixed bit pattern (see 22.3.8.3.6)

IEEE 802.11ac-2013, p. 295.



**Figure 22-18—VHT-SIG-A1 structure**

IEEE 802.11ac-2013, p. 259.

65.    The Accused Products include instructions that, when executed, result in "receiving, at the wireless communication unit, two or more feedback frames from two or more wireless communication devices of the plurality of wireless communication devices." For example, as evidenced by the 802.11ac standards, the Accused Products include instructions that cause a wireless communication unit to, after initiating a feedback sequence by transmitting the

VHT NDP announcement frame, receive VHT compressed beamforming feedback from addressed STAs.

**9.31.5.2 Rules for VHT sounding protocol sequences**

A VHT beamformer shall initiate a sounding feedback sequence by transmitting a VHT NDP Announcement frame followed by a VHT NDP after a SIFS. The VHT beamformer shall include in the VHT NDP Announcement frame one STA Info field for each VHT beamformee that is expected to prepare VHT Compressed Beamforming feedback and shall identify the VHT beamformee by including the VHT beamformee's AID in the AID subfield of the STA Info field. The VHT NDP Announcement frame shall include at least one STA Info field.

IEEE 802.11ac-2013, p. 168.

**22.3.11.2 Beamforming Feedback Matrix V**

Upon receipt of a VHT NDP sounding PPDU, the beamformee shall remove the space-time stream CSD in Table 22-11 from the measured channel before computing a set of matrices for feedback to the beamformer. The beamforming feedback matrix, $V_{k,u}$, found by the beamformee $u$ for subcarrier $k$ shall be compressed in the form of angles using the method described in 20.3.12.3.6. The angles, $\phi(k,v)$ and $\psi(k,u)$, are quantized according to Table 8-53e. The number of bits for quantization is chosen by the beamformee, based on the indication from the beamformer as to whether the feedback is requested for SU-MIMO beamforming or DL-MU-MIMO beamforming. The compressed beamforming feedback using 20.3.12.3.6 is the only Clause 22 beamforming feedback format defined.

IEEE 802.11ac-2013, p. 294.

66. The Accused Products include instructions that, when executed, result in "determining two or more beamforming schemes based on the two or more feedback frames, and simultaneously transmitting two or more different wireless communication transmissions from the wireless communication unit to the two or more wireless communication devices, respectively, using the two or more beamforming scheme." For example, as evidenced by the 802.11ac standards, the Accused Products include instructions that cause a wireless communication unit to use beamforming feedback received from beamformee STAs to compute steering matrices ("beamforming schemes") that are applied to respective DL signals transmitted to the STAs simultaneously.

SU-MIMO and DL-MU-MIMO beamforming are techniques used by a STA with multiple antennas (the beamformer) to steer signals using knowledge of the channel to improve throughput. With SU-MIMO beamforming all space-time streams in the transmitted signal are intended for reception at a single STA. With DL-MU-MIMO beamforming, disjoint subsets of the space-time streams are intended for reception at different STAs.

...

For DL-MU-MIMO beamforming, the receive signal vector in subcarrier $k$ at beamformee $u$, $y_{k,u} = [y_{k,0}, y_{k,1}, \ldots, y_{k,N_{RX_u}-1}]^T$, is shown in Equation (22-101), where $x_k = [x_{k,0}^T, x_{k,1}^T, \ldots, x_{k,N_{user}}^T-1]^T$ denotes the transmit signal vector in subcarrier $k$ for all $N_{user}$ beamformees, with $x_{k,u} = [x_{k,0}, x_{k,1}, \ldots, x_{k,N_{user}-1}]^T$ being the transmit signal for beamformee $u$.

$$y_{k,u} = H_{k,u} \times [Q_{k,0}, Q_{k,1}, \ldots, Q_{k,N_{user}-1}] \times x_k + n \qquad (22\text{-}101)$$

where

| | |
|---|---|
| $H_{k,u}$ | is the channel matrix from the beamformer to beamformee $u$ in subcarrier $k$ with dimensions $N_{RX_u} \times N_{TX}$ |
| $N_{RX_u}$ | is the number of receive antennas at beamformee $u$ |
| $Q_{k,u}$ | is a steering matrix for beamformee $u$ in subcarrier $k$ with dimensions $N_{TX} \times N_{STS_u}$ |
| $N_{user}$ | is the number of VHT MU PPDU recipients (see Table 22-6) |
| $n$ | is a vector of additive noise and may include interference |

The DL-MU-MIMO steering matrix $Q_k = [Q_{k,0}, Q_{k,1}, \ldots, Q_{k,N_{user}-1}]$ can be determined by the beamformer using the beamforming feedback matrices for subcarrier $k$ from beamformee $u$, $V_{k,u}$ and SNR information for subcarrier $k$ from beamformee $u$, $SNR_{k,u}$, where $u = 0, 1, \ldots, N_{user} - 1$. The steering matrix that is computed (or updated) using new beamforming feedback matrices and new SNR information from some or all of participating beamformees might replace the existing steering matrix $Q_k$ for the next DL-MU-MIMO data transmission. The beamformee group for the MU transmission is signaled using the Group ID field in VHT-SIG-A (see 22.3.8.3.3 and 22.3.11.4).

IEEE 802.11ac-2013, pp. 293-94.

67. By way of further illustration, the Accused Products that support Wi-Fi 6 or later meet each and every element of claim 18 of the '154 patent based on their support and/or use of HE features and protocols, including the HE sounding protocol. The Accused Products that support Wi-Fi 6 or later include or are associated with memory that stores instructions for implementing wireless communications according to 802.11ax (Wi-Fi 6) standards (i.e., the Accused Products that support Wi-Fi 6 or later include "[a] computer program product comprising a non-transitory storage medium having stored thereon instructions").

68. The Accused Products that support Wi-Fi 6 or later include instructions that, when executed, result in "reserving, by a wireless communication unit, a wireless communication medium for a time period." For example, as evidenced by the 802.11ax standards, the Accused Products that support Wi-Fi 6 or later include instructions that cause a wireless access point to set

a "Duration" field transmitted in a HE NDP Announcement frame to reserve a WLAN channel for a period indicated by the "Duration" field.



**Figure 26-8—Example of HE TB sounding**

IEEE 802.11ax-2021, p. 379.



**Figure 9-61a—HE NDP Announcement frame format**

IEEE 802.11ax-2021, p. 105.

69.    The Accused Products that support Wi-Fi 6 or later include instructions that, when executed, result in a wireless communication unit "during the reserved time period, transmitting at least one beamforming-training initiation frame from the wireless communication unit to a group of plurality of wireless communication devices using one or more addresses assigned to the plurality of wireless communication devices in the group." For example, as evidenced by the 802.11ax standards, the Accused Products that support Wi-Fi 6 or later include instructions that cause a wireless access point unit to transmit a HE sounding NDP ("beamforming-training initiation frame") to target STAs identified by the STAs' Association IDs included in the STA Info fields of the HE NDP Announcement frame (i.e., "a group of plurality of wireless communication

24

devices using one or more addresses assigned to the plurality of wireless communication devices in the group").



**Figure 26-8—Example of HE TB sounding**

IEEE 802.11ax-2021, p. 379.



**Figure 27-45—HE sounding NDP format**

IEEE802.11ax-2001, p. 628.

70.    The Accused Products that support Wi-Fi 6 or later include instructions that, when executed, result in "receiving, at the wireless communication unit, two or more feedback frames from two or more wireless communication devices of the plurality of wireless communication devices." For example, as evidenced by the 802.11ax standards, the Accused Products that support Wi-Fi 6 or later include instructions that cause a wireless communication unit to, after transmitting the HE sounding NDP, receive HE Compressed Beamforming/CQI feedback from addressed STAs, which include an HE Compressed Beamforming Report field and HE MU Exclusive Beamforming Report field.



**Figure 26-8—Example of HE TB sounding**

IEEE 802.11ax-2021, p. 379.

71.     The Accused Products that support Wi-Fi 6 or later include instructions that, when executed, result in "determining two or more beamforming schemes based on the two or more feedback frames, and simultaneously transmitting two or more different wireless communication transmissions from the wireless communication unit to the two or more wireless communication devices, respectively, using the two or more beamforming scheme." For example, as evidenced by the 802.11ax standards, the Accused Products that support Wi-Fi 6 or later include instructions that cause a wireless communication unit to use beamforming feedback received from beamformee STAs to compute steering matrices ("beamforming schemes") that are applied to respective DL signals transmitted to the STAs simultaneously.

### 9.4.1.65 HE Compressed Beamforming Report field

The HE Compressed Beamforming Report field carries the average SNR of each space-time stream and compressed beamforming feedback matrices $V$ for use by a transmit beamformer to determine steering matrices $Q$, as described in 10.34.3 and 19.3.12.3.

IEEE 802.11ax-2021, p. 136.

### 9.4.1.66 HE MU Exclusive Beamforming Report field

The HE MU Exclusive Beamforming Report field carries explicit feedback in the form of delta SNRs. The information in the HE Compressed Beamforming Report field and the HE MU Exclusive Beamforming Report field can be used by the transmit MU beamformer to determine the steering matrices $Q$, as described in 27.3.3.1.

IEEE 802.11ax-2021, p. 143.

*Indirect Infringement (Inducement – 35 U.S.C. § 271(b))*

72.     In addition and/or in the alternative to its direct infringements, NXP has indirectly infringed one or more claims of the '154 patent by knowingly and intentionally inducing others, including its subsidiaries, distributors, affiliates, retailers, suppliers, integrators, importers, customers, and/or consumers, to directly infringe by making, using, offering to sell, selling and/or importing into the United States the Accused Products.

73.     At a minimum, NXP had knowledge of the '154 patent and its infringements since the filing of this complaint. NXP has also had knowledge of the '154 patent and its infringements based on pre-suit communications with K.Mizra, including by letter to Ms. Joanna Geld, Senior Patent Counsel for NXP, on March 13, 2025 that identified the '154 patent to NXP and notifying NXP that Accused Products that support Wi-Fi 5, Wi-Fi 6, and/or Wi-Fi 7 (including NXP 88W8887; NXP 88W8987; NXP 88W8964; NXP 88W8997; NXP Apalis iMX8QM; NXP 88W8897; NXP 88W8897P; NXP 88W9098; NXP 88W9064; NXP AW690; NXP AW693; NXP AW692; NXP AW611; NXP 88W9064; NXP IW620; NXP IW612; NXP IW610; NXP IW61l) infringe the '154 patent. Since receiving notice of its infringements, NXP actively induced the direct infringements of its subsidiaries, distributors, affiliates, retailers, suppliers, integrators, importers, customers, and/or consumers as set forth under U.S.C. § 271(b). Such inducements have been committed with the knowledge, or with willful blindness to the fact, that the acts induced constitute infringement of the '154 patent. On information and belief, NXP intended to cause and took affirmative steps to induce infringement by, among other things, creating and disseminating advertisements and instructive materials that promote the infringing use of the Accused Products (e.g., advertisements and instructive materials that promote the support and use of Wi-Fi 5, Wi-Fi 6, and/or Wi-Fi 7 by Accused Products); creating and/or maintaining established distribution

channels for the Accused Products into and within the United States; manufacturing the Accused Products in conformity with U.S. laws and regulations; distributing or making available datasheets supporting use of the Accused Products that promote their features, specifications, and applications; providing technical documentation and tools for the Accused Products, such as white papers, brochures, and/or manuals that describe how to implement support of Wi-Fi communications by the Accused Products); promoting the incorporation of the Accused Products into end-user products; testing and certifying related to conformance with Wi-Fi standards for Accused Products; and/or by providing technical support and/or related services for the Accused Products to purchasers in the United States.

*Damages*

74.    K.Mizra has been damaged as a result of NXP's infringing conduct described in this Count. NXP is, thus, liable to K.Mizra in an amount that adequately compensates it for NXP's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284. K.Mizra has complied with the marking requirements of 35 U.S.C. § 287(a). K.Mizra does not make any products for which the marking requirement of 35 U.S.C. § 287(a) applies.

75.    On information and belief, despite having knowledge of the '154 patent and knowledge that it directly and/or indirectly infringes one or more claims of the '154 patent, NXP has nevertheless continued its infringing conduct and has disregarded an objectively high likelihood of infringement. NXP's infringing activities relative to the '154 patent have, thus, been, and continue to be, willful, wanton, and deliberate in disregard of K.Mizra's rights with respect to the '154 patent, justifying enhanced damages under 35 U.S.C. § 284.

## COUNT II

### (INFRINGEMENT OF U.S. PATENT NO. 8,873,531)

76.　　K.Mizra incorporates the preceding paragraphs herein by reference.

77.　　This cause of action arises under the patent laws of the United States, and, in particular, 35 U.S.C. §§ 271, *et seq*.

78.　　K.Mizra is the owner of all substantial rights, title, and interest in and to the '531 patent, including the right to exclude others and to enforce, sue, and recover damages for past, present, and future infringements.

79.　　The '531 patent is valid, enforceable, and was duly and legally issued by the United States Patent and Trademark Office on October 28, 2014, after full and fair examination.

80.　　NXP has infringed (and continues to infringe) one or more claims of the '531 patent in this District and elsewhere in Texas and the United States by making, using, selling, offering to sell, and/or importing, and by actively inducing others to make, use, sell, offer to sell, and/or import, Accused Products, which include (but are not limited to) NXP 88W8887; NXP 88W8987; NXP 88W8964; NXP 88W8997; NXP Apalis iMX8QM; NXP 88W8897; NXP 88W8897P; NXP 88W9098; NXP 88W9064; NXP AW690; NXP AW693; NXP AW692; NXP AW611; NXP 88W9064; NXP IW620; NXP IW612; NXP IW610; NXP IW61l. Upon information and belief, each Accused Product supports Wi-Fi communications according to the 802.11ac (and later) specifications, including devices marketed as supporting Wi-Fi 5, Wi-Fi 6, and/or Wi-Fi 7.

*Direct Infringement (35 U.S.C. § 271(a))*

81.　　NXP directly infringes one or more claims of the '531 patent in this District and elsewhere in Texas and the United States.

82.　　To this end, NXP directly infringes, either by itself or via its agent(s), at least claim 16 of the '531 patent under 35 U.S.C. § 271(a) by using (including through testing or

demonstration), selling, offering to sell, and/or importing Accused Products. Furthermore, NXP made and sold the Accused Products outside of the United States and either delivered those products to its customers, distributors, and/or subsidiaries in the United States, or, in the case that it delivered the Accused Products outside of the United States, it did so intending and/or knowing that those products were destined for the United States and/or designed and designated for sale in the United States, thereby directly infringing the '531 patent. *See, e.g., Lake Cherokee Hard Drive Techs., L.L.C. v. Marvell Semiconductor, Inc.*, 964 F. Supp. 2d 653, 658 (E.D. Tex. 2013).

83.    By way of illustration only, the Accused Products meet each and every element of claim 16 of the '531 patent based on their support and/or use of VHT features and protocols, including transmitting VHT PPDU. The Accused Products include or are associated with memory that stores instructions for implementing wireless communications according to 802.11ac (Wi-Fi 5) standards (i.e., the Accused Products are "an article including a non-transitory storage medium having stored thereon instructions").

84.    The Accused Products include instructions that, when executed, result in "transmitting beamforming configuration information to a plurality of stations, prior to transmitting a beamformed portion of a wireless communication frame to the plurality of stations using a plurality of respective beamforming configurations." For example, as evidenced by the 802.11ac standards, the Accused Products include instructions that cause a wireless access point to transmit a VHT PPDU, which includes a VHT-SIG-A field that carries information related to beamforming configuration, to a plurality of STAs.

**22.3.2 VHT PPDU format**

A single PPDU format is defined for this PHY: the VHT PPDU format. Figure 22-4 shows the VHT PPDU format.



**Figure 22-4—VHT PPDU format**

IEEE 802.11ac-2013, p. 229. As evidenced above, VHT-SIG-A is transmitted before Data in a VHT PPDU. A Q matrix is applied to the Data portion of a VHT PPDU (i.e., "a beam formed portion of a wireless communication frame") to provide spatial mapping (beamforming) to the Data portion of the VHT PPDU on a per-station basis (i.e., "using a plurality of respective beamforming configurations").

### 22.3.4.10 Construction of the Data field in a VHT MU PPDU

### 22.3.4.10.1 General

For an MU transmission, the PPDU encoding process is performed on a per-user basis up to the input of the Spatial Mapping block except CSD (as described in 22.3.8.3.2). All user data is combined and mapped to the transmit chains in the Spatial Mapping block.

### 22.3.4.10.2 Using BCC

A Data field with BCC encoding is constructed using the process described in 22.3.4.9.1 before the spatial mapping block and repeated for each user that uses BCC encoding.

### 22.3.4.10.3 Using LDPC

A Data field with LDPC encoding is constructed using the process described in 22.3.4.9.2 before the spatial mapping block and repeated for each user that uses LDPC encoding.

### 22.3.4.10.4 Combining to form a VHT MU PPDU

The per-user data is combined as follows:

a)  Spatial Mapping: The $Q$ matrix is applied as described in 22.3.10.11.1. The combining of all user data is done in this block.

b)  Phase rotation: Apply the appropriate phase rotations for each 20 MHz subchannel as described in 22.3.7.4 and 22.3.7.5.

c)  IDFT: Compute the inverse discrete Fourier transform.

d)  Insert GI and apply windowing: Prepend a GI (SHORT_GI or LONG_GI) and apply windowing as described in 22.3.7.4.

e)  Analog and RF: Up-convert the resulting complex baseband waveform associated with each transmit chain to an RF signal according to the center frequency of the desired channel and transmit. Refer to 22.3.7.4 and 22.3.8 for details.

IEEE 802.11ac-2013, p. 243.

85.    As evidenced by the 802.11ac standards, the "beamforming configuration information defines the plurality of beamforming configurations." For example, the VHT-SIG-A field defines beamforming configurations for multiple STAs, including configurations provided in the fields MU[0-3] NSTS and MU[1-3] Coding.



**Figure 22-18—VHT-SIG-A1 structure**



**Figure 22-19—VHT-SIG-A2 structure**

The VHT-SIG-A field contains the fields listed in Table 22-12. The mapping of the fields is also described in Table 22-12. Note that the mapping of the STBC field, the NSTS/Partial AID field, the SU/MU[0] Coding field, the SU VHT-MCS/MU[1-3] Coding field, and the Beamformed field is different for VHT SU and MU PPDUs.

IEEE 802.11ac-2013, p. 259.

86.     As discussed above, the Accused Products include instructions that, when executed, result in "transmitting beamforming configuration information to a plurality of stations." As further evidenced by the 802.11ac standards, the "transmitting the beamforming configuration information comprises transmitting the beamforming configuration information as part of a non-beamformed portion of said wireless communication frame." For example, as illustrated below, spatial mapping (beam forming) is not applied to the VHT-SIG-A field, as evidenced by the fact that the Q matrix is not applied when constructing VHT-SIG-A.

33

**22.3.4.5 Construction of VHT-SIG-A**

The VHT-SIG-A field consists of two symbols, VHT-SIG-A1 and VHT-SIG-A2, as defined in 22.3.8.3.3 and is constructed as follows:

a)  Obtain the CH_BANDWIDTH, STBC, GROUP_ID, PARTIAL_AID (SU only), NUM_STS, GI_TYPE, FEC_CODING, MCS (SU only), BEAMFORMED (SU only), NUM_USERS, and TXOP_PS_NOT_ALLOWED from the TXVECTOR. Add the reserved bits, append the calculated CRC, then append the $N_{tail}$ tail bits as shown in 22.3.8.3.3. This results in 48 uncoded bits.

b)  BCC encoder: Encode the data by a convolutional encoder at the rate of R=1/2 as described in 18.3.5.6

c)  BCC interleaver: Interleave as described in 18.3.5.7.

d)  Constellation mapper: BPSK modulate the first 48 interleaved bits as described in 18.3.5.8 to form the first symbol of VHT-SIG-A. BPSK modulate the second 48 interleaved bits and rotate by 90° counter-clockwise relative to the first symbol to form the second symbol of VHT-SIG-A.

e)  Pilot insertion: Insert pilots as described in 18.3.5.10.

f)  Duplication and phase rotation: Duplicate VHT-SIG-A1 and VHT-SIG-A2 over each 20 MHz of the CH_BANDWIDTH. Apply the appropriate phase rotation for each 20 MHz subchannel as described in 22.3.7.4 and 22.3.7.5.

g)  IDFT: Compute the inverse discrete Fourier transform.

h)  CSD: Apply CSD for each transmit chain as described in 22.3.8.2.1.

i)  Insert GI and apply windowing: Prepend a GI (LONG_GI) and apply windowing as described in 22.3.7.4.

j)  Analog and RF: Up-convert the resulting complex baseband waveform associated with each transmit chain to an RF signal according to the center frequency of the desired channel and transmit. Refer to 22.3.7.4 and 22.3.8 for details.

IEEE 802.11ac-2013, pp. 237-38; *Cf* IEEE 802.11ac-2013, p. 243 (showing application of spatial multiplexing to Data field).

87.    By way of further illustration, the Accused Products that support Wi-Fi 6 or later meet each and every element of claim 16 of the '531 patent based on their support and/or use of HE features and protocols, including transmitting HE MU PPDU. The Accused Products that support Wi-Fi 6 or later include or are associated with memory that stores instructions for implementing wireless communications according to 802.11ax (Wi-Fi 6) standards (i.e., they are "an article including a non-transitory storage medium having stored thereon instructions").

88.    The Accused Products that support Wi-Fi 6 or later include instructions that, when executed, result in "transmitting beamforming configuration information to a plurality of stations,

prior to transmitting a beamformed portion of a wireless communication frame to the plurality of stations using a plurality of respective beamforming configurations." For example, as evidenced by the 802.11ax standards, the Accused Products that support Wi-Fi 6 or later include instructions that cause a wireless access point to transmit a HE MU PPDU, which includes a HE-SIG-B field that carries information related to beamforming configuration, to a plurality of STAs.



**Figure 27-9—HE MU PPDU format**

IEEE 802.11ax-2021, p. 510.



**Figure 27-23—Timing boundaries for HE PPDU fields if midamble is not present**

IEEE 802.11ax-2021, p. 534. As evidenced above, HE-SIG-B is transmitted before Data in a HE MU PPDU. A Q matrix is applied to the Data portion of a HE MU PPDU (i.e., "a beam formed portion of a wireless communication frame") to provide spatial mapping (beamforming) to the Data portion of the HE MU PPDU on a per-station basis (i.e., "using a plurality of respective beamforming configurations").

### 27.3.6.11 Construction of the Data field in an HE MU PPDU

#### 27.3.6.11.1 General

In an HE MU transmission, the PPDU encoding process is performed independently in an RU on a per user basis up to the input of the spatial mapping block, except that CSD is performed with knowledge of the space-time streams starting index for that user. All user data in an RU is combined and mapped to the transmit chains in the spatial mapping block.

#### 27.3.6.11.2 Using BCC

A Data field with BCC encoding is constructed using steps a) to l) in 27.3.6.10.1 and then applying CSD for an HE MU PPDU as described in 27.3.11.2.2.

#### 27.3.6.11.3 Using LDPC

A Data field with LDPC encoding is constructed using steps a) to l) in 27.3.6.10.2 and then applying CSD for an HE MU PPDU as described in 27.3.11.2.2.

#### 27.3.6.11.4 Combining to form an HE MU PPDU

The per user data is combined as follows:

a) Spatial mapping: The $Q$ matrix is applied as described in 27.3.12.14. The combining of all user data of an RU is done in this block.

b) IDFT: Compute the inverse discrete Fourier transform.

c) GI and windowing: Prepend a GI determined by the TXVECTOR parameter GI_TYPE, and apply windowing as described in 27.3.10.

d) Analog and RF: Upconvert the resulting complex baseband waveform with each transmit chain to an RF signal according to the center frequency of the desired channel and transmit. Refer to 27.3.10 and 27.3.11 for details.

IEEE 802.11ax-2021, pp. 527-28.

89.    As evidenced by the 802.11ax standards, the "beamforming configuration information defines the plurality of beamforming configurations." For example, the HE-SIG-B field defines beamforming configurations for multiple STAs, including configurations provided in User Specific Fields (e.g., Spatial Configuration, HE-MCS).



**Figure 27-26—HE-SIG-B content channel format**

IEEE 802.11ax-2021, p. 560.

**Table 27-29—User field format for MU-MIMO allocation**

| Bit | Subfield | Number of bits | Description |
|---|---|---|---|
| B0–B10 | STA-ID | 11 | Set to a value indicated from TXVECTOR parameter STA_ID (see 26.11.1). |
| B11–B14 | Spatial Configuration | 4 | If the STA-ID subfield is not 2046, indicates the number of spatial streams for a user in an MU-MIMO allocation (see Table 27-30). <br><br> Set to an arbitrary value if the STA-ID subfield is 2046. |
| B15–B18 | HE-MCS | 4 | If the STA-ID subfield is not 2046, indicates the modulation and coding scheme: <br> Set to $n$ for HE-MCS $n$, where $n = 0, 1, 2, \ldots, 11$. <br> Values 12-15 are reserved. <br><br> Set to an arbitrary value if the STA-ID subfield is 2046. |
| B19 | Reserved | 1 | If the STA-ID subfield is not 2046, reserved and set to 0. <br><br> Set to an arbitrary value if the STA-ID subfield is 2046. |
| B20 | Coding | 1 | If the STA-ID subfield is not 2046, indicates whether BCC or LDPC is used: <br> Set to 0 for BCC. <br> Set to 1 for LDPC. <br><br> Set to an arbitrary value if the STA-ID subfield is 2046. |

IEEE 802.11ax-2021, p. 570.

90.     As discussed above, the Accused Products that support Wi-Fi 6 or later include instructions that, when executed, result in "transmitting beamforming configuration information to a plurality of stations." As further evidenced by the 802.11ax standards, the "transmitting the beamforming configuration information comprises transmitting the beamforming configuration information as part of a non-beamformed portion of said wireless communication frame." For example, as illustrated below, spatial mapping (beam forming) is not applied to the HE-SIG-B field, as evidenced by the fact that the Q matrix is not applied when constructing HE-SIG-B.

**27.3.6.7 Construction of HE-SIG-B field**

For an HE MU PPDU, the HE-SIG-B field consists of a Common field followed by a User Specific field as defined in 27.3.11.8 and is constructed as follows:

a) Obtain the HE-SIG-B field values from the TXVECTOR. Add the reserved bits, append the calculated CRC, and then append the $N_{tail}$ tail bits as shown in 27.3.11.8.

b) BCC encoder: Encode the Common field data and each User Block field data individually by a convolutional encoder as described in 27.3.12.5.1.

c) BCC interleaver: Interleave as described in 27.3.12.8.

d) Constellation mapper: Obtain MCS_SIG_B from the TXVECTOR and use it to modulate the interleaved bits as described in 27.3.12.9 to form the HE-SIG-B OFDM symbols.

e) Pilot insertion: Insert pilots as described in 17.3.5.9.

f) Duplicate and phase rotation: Duplicate HE-SIG-B OFDM symbols as described in 27.3.11.8.5. Apply the appropriate phase rotation for each 20 MHz subchannel as described in 27.3.10 and 21.3.7.5.

g) IDFT: Compute the inverse Fourier transform.

h) CSD per chain: Apply CSD per chain for each transmit chain and frequency segment as described in 27.3.11.2.1.

i) GI and windowing: Prepend a GI ($T_{GI,Pre-HE}$), and apply windowing as described in 27.3.10.

j) Analog and RF: Upconvert the resulting complex baseband waveform associated with each transmit chain to an RF signal according to the center frequency of the desired channel and transmit. Refer to 27.3.10 and 27.3.11 for details.

IEEE 802.11ax-2021, p. 525; *Cf* IEEE 802.11ax-2013, pp. 527-528 (showing application of spatial multiplexing to Data field).

***Indirect Infringement (Inducement – 35 U.S.C. § 271(b))***

91.    In addition and/or in the alternative to its direct infringements, NXP has indirectly infringed one or more claims of the '531 patent by knowingly and intentionally inducing others, including its subsidiaries, distributors, affiliates, retailers, suppliers, integrators, importers, customers, and/or consumers, to directly infringe by making, using, offering to sell, selling and/or importing into the United States the Accused Products..

92.    At a minimum, NXP had knowledge of the '531 patent and its infringements since the filing of this complaint. NXP has also had knowledge of the '531 patent and its infringements based on pre-suit communications with K.Mizra, including by letter to Ms. Joanna Geld, Senior Patent Counsel for NXP, on March 13, 2025 that identified the '531 patent to NXP and notifying NXP that Accused Products that support Wi-Fi 5, Wi-Fi 6, and/or Wi-Fi 7 (including NXP 88W8887; NXP 88W8987; NXP 88W8964; NXP 88W8997; NXP Apalis iMX8QM; NXP 88W8897; NXP 88W8897P; NXP 88W9098; NXP 88W9064; NXP AW690; NXP AW693; NXP

AW692; NXP AW611; NXP 88W9064; NXP IW620; NXP IW612; NXP IW610; NXP IW61l) infringe the '531 patent. Since receiving notice of its infringements, NXP actively induced the direct infringements of its subsidiaries, distributors, affiliates, retailers, suppliers, integrators, importers, customers, and/or consumers as set forth under U.S.C. § 271(b). Such inducements have been committed with the knowledge, or with willful blindness to the fact, that the acts induced constitute infringement of the '531 patent. On information and belief, NXP intended to cause and took affirmative steps to induce infringement by, among other things, creating and disseminating advertisements and instructive materials that promote the infringing use of the Accused Products (e.g., advertisements and instructive materials that promote the support and use of Wi-Fi 5, Wi-Fi 6, and/or Wi-Fi 7 by Accused Products); creating and/or maintaining established distribution channels for the Accused Products into and within the United States; manufacturing the Accused Products in conformity with U.S. laws and regulations; distributing or making available datasheets supporting use of the Accused Products that promote their features, specifications, and applications; providing technical documentation and tools for the Accused Products, such as white papers, brochures, and/or manuals that describe how to implement support of Wi-Fi communications by the Accused Products); promoting the incorporation of the Accused Products into end-user products; testing and certifying related to conformance with Wi-Fi standards for Accused Products; and/or by providing technical support and/or related services for the Accused Products to purchasers in the United States.

### *Damages*

93.    K.Mizra has been damaged as a result of NXP's infringing conduct described in this Count. NXP is, thus, liable to K.Mizra in an amount that adequately compensates it for NXP's infringements, which, by law, cannot be less than a reasonable royalty, together with interest and

costs as fixed by this Court under 35 U.S.C. § 284. K.Mizra has complied with the marking requirements of 35 U.S.C. § 287(a). K.Mizra does not make any products for which the marking requirement of 35 U.S.C. § 287(a) applies.

94.    On information and belief, despite having knowledge of the '531 patent and knowledge that it directly and/or indirectly infringes one or more claims of the '531 patent, NXP has nevertheless continued its infringing conduct and has disregarded an objectively high likelihood of infringement. NXP's infringing activities relative to the '531 patent have, thus, been, and continue to be, willful, wanton, and deliberate in disregard of K.Mizra's rights with respect to the '531 patent, justifying enhanced damages under 35 U.S.C. § 284.

## CONCLUSION

95.    K.Mizra is entitled to recover from NXP the damages sustained by K.Mizra as a result of NXP's wrongful acts and willful infringements in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court.

96.    K.Mizra has incurred and will incur attorneys' fees, costs, and expenses in the prosecution of this action. The circumstances of this dispute may give rise to an exceptional case within the meaning of 35 U.S.C. § 285, and, in such case, K.Mizra is entitled to recover its reasonable and necessary attorneys' fees, costs, and expenses.

## JURY DEMAND

K.Mizra hereby requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

K.Mizra respectfully requests that the Court find in its favor and against NXP, and that the Court grant K.Mizra the following relief:

(i)     Judgment that one or more claims of the Asserted Patents have been infringed, either literally and/or under the doctrine of equivalents, by NXP;

(ii)    Judgment that one or more claims of the Asserted Patents have been willfully infringed, either literally and/or under the doctrine of equivalents, by NXP;

(iii)   Judgment that NXP account for and pay to K.Mizra all damages and costs incurred by K.Mizra because of NXP's infringements and other conduct complained of herein, including an accounting for any sales or damages not presented at trial;

(iv)    Judgment that NXP account for and pay to K.Mizra a reasonable, ongoing, post-judgment royalty because of NXP's infringements, including continuing infringing activities, and other conduct complained of herein;

(v)     Judgment that K.Mizra be granted pre-judgment and post-judgment interest on the damages caused by NXP's infringements and other conduct complained of herein;

(vi)    Judgment that this case is exceptional under the provisions of 35 U.S.C. § 285 and award enhanced damages; and

(vii)   Such other and further relief as the Court deems just and equitable.


Dated: December 5, 2025                          Respectfully submitted,


                                                 By: /s/Patrick J. Conroy

                                                 Patrick J. Conroy
                                                 Texas Bar No. 24012448
                                                 Ryan P. Griffin
                                                 Texas Bar No. 24053687
                                                 T. William Kennedy

Texas Bar No. 24055771
Jonathan H. Rastegar
Texas Bar No. 24064043
Nelson Bumgardner Conroy PC
2727 N. Harwood Street, Suite 250
Dallas, Texas 75201
Tel: (214) 446-4950
pat@nelbum.com
ryan@nelbum.com
bill@nelbum.com
jon@nelbum.com

Of Counsel:
Qi (Peter) Tong
Texas Bar No. 24119042
Russ August & Kabat
8080 N. Central Expy., Suite 1503
Dallas, TX 75206
ptong@raklaw.com

**Counsel for K.Mizra LLC**